**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **IN RE PMA CAPITAL CORPORATION SECURITIES LITIGATION** | : : : : | **MASTER FILE NO. 03-6121** |
| **This Document Relates to:** | : : | **CLASS ACTION** |
| **ALL ACTIONS** | : : : | |

**MEMORANDUM AND ORDER**

**Tucker, J.**                                                                                                                **July 27, 2005**

Presently before this Court are the Defendants' Motions to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) (Docs. 36,37,39-43, 48&50), Plaintiffs' Memoranda in Opposition (Docs. 52-56), the Defendants' Reply Memoranda (Docs. 57-62), and the various supplemental materials submitted by the parties.  The Court heard oral argument on this matter on April 11, 2005.  In their papers and at argument, Defendants contended that the facts, as plead, do not state causes of action under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").  Defendants also submit that Plaintiffs have not plead their fraud allegations with particularity, as required by Fed. R. Civ. P. 9(b) and that certain Plaintiffs lack standing to pursue the claims discussed below.  Plaintiffs plead five claims in their Amended Complaint.  The first two claims are based on the Exchange Act; the last three are based on the Securities Act.  For the reasons set forth below, the Court will deny in part and grant in part Defendants' motions to dismiss.

## I. FACTUAL BACKGROUND

The events giving rise to this action involve Defendant PMA Capital Corporation ("PMA"), an insurance holding company.[1]  Plaintiffs are a class of persons or entities that purchased PMA securities from May 5, 1999 through February 11, 2004 (the "Class Period") and who claim to have been damaged by those purchases.[2]  These Plaintiffs seek relief under the Exchange Act.  Plaintiffs also bring claims on behalf of a sub-class of Plaintiffs composed of those who purchased securities pursuant to public offerings by Defendant PMA in December 2001, October 2002 and June 2003.  Plaintiffs seek relief for those public offerings under the Securities Act.  On September 21, 2004, the Plaintiffs filed an Amended Consolidated Class Action Complaint (the "Amended Complaint") (Doc. 25) alleging violations of both the Exchange Act and the Securities Act.  Subsequently, Defendants filed these motions to dismiss, which the Court now considers.

In the Amended Complaint, Plaintiffs separated the Defendants into two groups.  The first group (collectively the "PMA Defendants"), consists of the Defendant PMA, and four former PMA senior executives (the "Individual PMA Defendants").[3]  The Plaintiffs bring the Exchange Act claims against the PMA Defendants.  The second group (the "Securities Act Defendants") includes all of the PMA Defendants as well as PMA Capital Trust I and PMA Capital Trust II (the "Trusts").

---

[1] The Court draws this factual narrative from the Amended Complaint.

[2]  The lead Exchange Act Plaintiffs in this case are Sheet Metal Workers Local 9 Pension Trust, Alaska Laborers Employers Retirement Fund and Communication Workers of America for Employees' Pension and Death Benefits.  Am. Compl. ¶¶ 15-17.  Plaintiffs for the Securities Act Claims are Arthur Pollin, Todd Augenbaum and Leonard Klinghoffer.  *Id.* at 18

[3] The individual PMA Defendants are Frederick Anton, III (former Chief Executive Officer and Chairman of the Board), John W. Smithson (former President and Chief Executive Officer), Francis W. McDonnell (former Chief Financial Officer and Treasurer), and William E. Hitselberger (former Chief Financial Officer for PMA and PMA Insurance Group).  Am. Compl. ¶¶ 20-24.

2

Both of the Trusts are statutory business trusts created under Delaware Law, sponsored by PMA, and are listed as registrants of two of the securities offerings.  In addition, in the Amended Complaint Plaintiffs name members of PMA's board of directors (the "Directors")[4] and four investment banks, Defendants Credit Suisse First Boston ("CSFB"), Banc of America Securities, LLC ("BOA"), Sandler, O' Neill & Partners, L.P. ("Sandler O' Neill") and Ferris, Baker, Watts, Inc. ("FBW"), which acted as underwriters for the public offerings at issue in the Securities Act claims.

At the beginning of the Class Period, PMA owned three operating segments.  The first, PMA Insurance Group, provided worker's compensation, disability and other standard lines of commercial property casualty insurance.  PMA Re, the second segment, provided property and casualty reinsurance.  Caliber One was the third operating segment, which provided excess and surplus insurance.  During the Class Period, PMA was responsible for the management and operation of each of the business segments.  Plaintiffs take issue with the following business management areas:  1) PMA's underwriting practices, 2) PMA's pricing controls, and 3) PMA's setting of loss reserves. Plaintiffs argue that the PMA Defendants failed in those areas and misrepresented those failures to shareholders.

In the insurance business, substantial periods of time may elapse between an insured's loss and the insurer's payment to the insured for that loss.  As a result, companies like PMA (and the business segments they manage) must maintain a combination of strong underwriting, price controls and adequate loss reserves. Insurance underwriting, involves the identification and selection of risks and the determination of an adequate price of insuring those risks given the expected losses.  Based

---

[4] The Directors that Plaintiffs name in the Amended Complaint are Paul I. Detwiler, Jr., Joseph H. Foster, Thomas J. Gallen, Anne S. Genter, James F. Malone, III, Louis N. McCarter, III, John W. Miller, Jr., Edward H. Owlett, Roderic H. Ross and L.J. Rowell, Jr.  Am. Compl. ¶ 30.

on those risks, insurers are required to establish reserves of the amounts needed to pay future claims. Underwriters call those amounts loss reserves.  Insurance companies also require loss reserves for loss adjustments.  Loss adjustment expenses are the costs of settling claims, including legal and other fees and general expenses of administrating the claims adjustment process.  Because insurance companies treat loss reserves as current liabilities for accounting purposes, the size of the reserves can affect the financial performance of companies in the insurance industry. Plaintiffs claim that PMA did not adequately manage the business segments in the areas of underwriting, pricing and loss reserves.

During different points in the class period, Defendants made numerous statements in press releases and in disclosure reports filed with the Securities and Exchange Commission (the "SEC"). Plaintiffs claim that these statements misrepresented this management, resulting in harm to PMA shareholders.  Among Defendants' statements were indications that PMA was "committed to a philosophy of strict underwriting discipline," focused on "sound underwriting and prudent reserving," and maintained "underwriting and actuarial expertise" with a "solid underwriting performance" and that PMA was able to maintain "adequate reserve levels."  Defendants further asserted that PMA's quarterly and year-end financial statements were prepared with Generally Accepted Accounting Principles ("GAAP").  Plaintiffs claim that these statements were false. Plaintiffs specifically  contend that the PMA Defendants aggressively underpriced insurance coverage, set PMA's loss reserves at materially inadequate levels and failed to maintain internal control deficiencies relating to underwriting and setting of loss reserves, all of which lead to the under performance of the two business segments Caliber One and PMA Re.  According to Plaintiffs, Defendants mislead investors by failing to disclose this information.

4

Plaintiffs contend that PMA substantially underpriced Caliber One's business while representing to shareholders that PMA's underwriting was "sound" and "patient." A July 2000 electronic list of Caliber One's business indicated that much of Caliber One's business was materially underpriced. A former, unnamed PMA director, confirms that insurance for Caliber One's classes of business was underpriced. Moreover, Caliber One issued coverage to numerous high risk businesses, including chemical manufacturers, abortion clinics, and high-risk general contractors. In addition, Defendants allegedly understaffed Caliber One, further impeding its ability to predict liability. On May 1, 2002, PMA announced the decision to withdraw from the Caliber One business as well as the need to increase loss reserves by $40 million. At that time, PMA disclosed that Caliber One's underwriting was not adequate and that there were a number of business classes with relatively small premium levels.

Additionally, Plaintiffs claim that PMA materially under-reserved the PMA Re business segment during the class period. From 1997 through 1999, the insurance industry was more competitive, and the underwriting conditions were softer than in the previous five years. However, during the class period, Plaintiffs recorded less conservative loss reserves than in the previous five years. These low reserves led to a dispute with Pricewaterhouse Coopers ("PwC"), PMA's outside auditor. Namely, during their 2002 year end audit, PwC insisted on a net increase of PMA Re's loss reserves of $45 million. As a result, PMA terminated PwC and subsequently retained Deloitte & Touche, LLP ("Deloitte"). As a condition of its retention, Deloitte required that a third-party review PMA's loss reserves. That firm, Bickerstaff, Whatley, Ryan & Burkhalter ("Bickerstaff"), identified an additional $150 million net loss reserve shortfall for PMA Re. Following Bickerstaff's finding,

the Pennsylvania Insurance Department retained Ernst & Young ("E&Y") to perform another independent review.  E&Y found an additional reserve shortfall at the PMA Insurance Group.

Ultimately, PMA terminated two of its operating segments, PMA Re and Caliber One, and two of the Individual PMA Defendants, Smithson and Anton, resigned.  PMA, which had paid dividends for the past 88 years, discontinued the issuance of dividends and continued to lose business.  PMA common stock declined by almost 80% and investors (in the aggregate) lost hundreds of millions of dollars.  PMA increased its net loss reserves by more than $300 million during the class period for the 1997-2000 accident years, excluding any charges related to September 11, 2001.  PMA's credit rating also declined as a result of the events of the class period.  This shareholder loss in revenue prompted the filing of the Exchange Act claims.

In addition to statements the individual PMA Defendants made during the Class Period, the Amended Complaint also alleges that Defendants made material misstatements in connection with three public offerings.  These three offerings are the subject of the Securities Act Claims.  On December 12, 2001, PMA issued 9,775,000 shares of common stock at $17.25 per share (the "Common Stock Offering").  PMA completed a public offering of 4.25% convertible senior debentures (the "Debentures Offering") on October 21, 2002.  On June 5, 2003, PMA completed a public offering of 8.5% monthly income senior notes (the "Senior Notes Offering").  With all three offerings, PMA issued a registration statement and prospectus indicating: 1) that they presented their financial results in accordance with GAAP, 2) their loss reserves were fairly stated and 3) that PMA had underwriting and actuarial expertise.  Plaintiffs allege that the three statements were materially false and therefore in violation of the Securities Act. All of the Securities Act Defendants participated in at least one of the three offerings.

## II. LEGAL STANDARD

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), district courts must take all the well pleaded allegations as true and construe the complaint in the light most favorable to the non-moving party, the plaintiff. *GSC Partners CDO Fund v. Washington,* 368 F. 3d 228, 236 (3d Cir. 2004) (citations omitted). The Court may look beyond the complaint to extrinsic documents when the Plaintiffs claims are based on those documents. *Id.* However, those documents must be "integral" to the claims or "explicitly relied upon in the complaint" for the Court to consider them at this stage. *In re Burlington Coat Factory Sec. Litig.,* 114 F. 3d 1410, 1426 (3d Cir. 1997) (citations omitted). This Court may only grant a motion to dismiss if it appears beyond a doubt that the plaintiff can prove no set of facts in support of their claim which would entitle him to relief. *GSC Partners*, 368 F. 3d at 236. The issue for the Court is not "whether a plaintiff will ultimately prevail" at trial, but "whether the claimant is entitled to offer evidence to support the claims." *Burlington,* 114 F.3d at 1420 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## III. THE EXCHANGE ACT CLAIMS

Plaintiffs set forth the Exchange Act allegations in paragraphs 51-211 of the Amended Complaint. Plaintiffs charge the PMA Defendants with knowingly or recklessly making materially false and misleading statements during the class period in press releases and SEC filings. Count I of the Complaint alleges violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder. Count II of the Complaint alleges violations of § 20(a) of the Exchange Act, 15 U.S.C. 78t.

Section 10(b) of the Exchange Act creates a private right of action for individuals harmed by misleading statements or material omissions that affect trading on the secondary market.

*Burlington,* 114 F. 3d at 1417 (citations omitted).  Under the authority of § 10(b), the SEC enacted Rule 10b-5, which makes it unlawful to misrepresent or omit material information in connection with the purchase or sale of securities.  *Shapiro v. UJB Fin. Corp.,* 964 F. 2d 272, 280 (3d Cir. 1992), *rehearing en banc denied*, 1992 U.S. App. LEXIS 15567 (3d Cir. 1992).  To state a claim under § 10(b) of the Exchange Act and Rule 10b-5, a private plaintiff must allege that the defendants: 1) made a misstatement or omission of material fact, 2) with scienter, 3) in connection with the purchase or sale of a security, 4) upon which the plaintiffs reasonably relied and 5) that the plaintiffs' reliance on the statement was the proximate cause of their injury.  *GSC Partners*, 368 F.3d at 236 (citations omitted).  To maintain a claim under § 20(a), a plaintiff must establish an underlying violation of the Exchange Act by a controlling person or entity.  *Shapiro,* 964 F. 2d at 279.  Plaintiffs must also show that the Defendants are controlling persons and, in some meaningful sense, were culpable participants in the fraud perpetrated by the controlled person or entity.  *Id.*

In addition to satisfying the above elements, a well plead Exchange Act claim must conform to the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4.  Enacted by Congress to remedy the tactic of filing securities complaints to force unwarranted settlements, the PSLRA "imposes another level of factual particularity to allegations of securities fraud." *Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp.,* 394 F. 3d 126, 145 (3d Cir. 2004).  All discovery is stayed pending the Court's consideration of a motion to dismiss and the Court must scrutinize the complaint under heightened pleading standards for securities fraud.  *See* 15 U.S.C. §78u-4(b)(3)(A)&(B).  The pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA apply to Rule 10b-5 class actions on a motion to dismiss.  *See Chubb,* 394 F. 3d at 145.  Plaintiffs must plead the circumstances surrounding the alleged fraud with particularity.  Fed. R. Civ. P. 9(b).  Also, plaintiffs must allege

that the defendant knew that the alleged misstatements were false.  *Burlington*, 114 F.3d at 1421.

Plaintiffs must specify each misstatement and the reason that it was misleading at the time that it was

made.  15 U.S.C. §78u-4(b)(1).  Plaintiffs must plead particular facts giving rise to a strong inference

that the defendants acted with scienter.  15 U.S.C. §78u-4(b)(2).

**A. PMA Defendants' Motion to Dismiss**

Plaintiffs allege that the PMA Defendants made false and misleading statements to investors

in press releases and SEC filings, regarding PMA's alleged under-performance.  Plaintiffs bring

claims specific to each PMA business segment.  The PMA Defendants contend that the management

of their business segments, PMA Re, Caliber One and PMA Insurance Group, was compliant with

the Exchange Act and at no time did they misstate this management.  Specifically, they argue that

they did not understate loss reserves or underprice insurance coverage for any of the business

segments in any publication or communication.  Plaintiffs also claim that overall PMA's internal

controls were deficient and that its financial statements were misleading.  In response, the PMA

Defendants submit that their actions with respect to internal controls and financial statements were

compliant.  Furthermore, Defendants contend that the Plaintiffs have not sufficiently plead scienter

for any of the Exchange Act claims or a § 20 violation.

**1. Claims Relating to PMA Re**

Plaintiffs claim that the PMA Defendants' statements regarding PMA Re's loss reserves and

insurance pricing were materially misleading.  The PMA Defendants move to dismiss the claims

involving PMA Re arguing that the alleged misstatements were not material and the Plaintiffs claims

involving the statements are not well plead.  Therefore, the issue for this Court is whether the PMA

Defendants' PMA Re statements are sufficient to plead fraud under the Exchange Act.

**a. The adequacy of the loss reserves**

Plaintiffs allege that Defendants made a number of false statements regarding PMA's "solid" underwriting practices and "adequate" loss reserves. Am. Compl. ¶¶ 94-182. Plaintiffs aver that PMA set the loss reserves at PMA Re at materially inadequate levels and that PMA falsely stated that management believed that the loss reserves were "fairly stated." *Id.* at ¶¶ 108, 112, 115, 119, 123, 126, 129, 136, 141, 148, 153, 157, 163, 173. Plaintiffs argue that these statements triggered a duty to disclose publicly the facts regarding the deficiencies in PMA's underwriting and the way PMA set loss reserves that Defendants kept hidden. Pl.'s Mem. at 21-22. Defendants make two main arguments regarding the loss reserve statements.[5] First, the PMA Defendants invoke both the bespeaks caution doctrine and the statutory safe harbor provision of the PSLRA, 15 U.S.C. § 78u-5(a)&(c)(1), regarding the loss reserve statements.[6] PMA Def.'s Mem. at 38-46. The bespeaks caution doctrine is shorthand to the well established principle that a statement must be considered in context to determine its materiality. *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1993). For the doctrine to apply, a statement must be forward looking and must be accompanied by cautionary language. *Trump,* 7 F.3d at 370-371. According to the PMA Defendants, loss reserves are forward looking because they are estimates or predictions of future financial liabilities. PMA Def.'s Mem. at 40-41. Reserves, by their nature, constantly change over time and cannot be validated until the future. *Id.* The PMA Defendants further submit that the

---

[5] The PMA Defendants also make the point that "[i]t is not a Securities Law violation to adjust loss reserves." PMA Def.'s Mem. at 36-37. The Court agrees, but notes that this argument mischaracterizes Plaintiffs' allegations. Plaintiffs allege that the *characterization* of the loss reserves violated the law, not the adjustment. Am. Compl. ¶¶69, 71-72, 94-182; Pl.'s Mem. at 19-22.

[6] The PLSRA statutory safe harbor provision provides similar protection to forward looking statements as the bespeaks caution doctrine. *See* 15 U.S.C. § 78u-5(a)&(c).

statement at issue was accompanied by cautionary language, therefore, not actionable.  The Court disagrees.

Statements about loss reserves and their adequacy are not *per se* forward-looking.  *See, e.g. Shapiro,* 964 F. 2d at 281; *See also In re Westinghouse Sec. Litig.,* 90 F. 3d 696, 709-710 (3d Cir. 1996) (finding that alleged misstatements regarding the adequacy of loan loss reserves would have assumed actual significance to a reasonable investor contemplating purchasing securities).  In *Shapiro*, plaintiffs, shareholders of a bank holding company, brought a securities fraud claim arising from the alleged misrepresentation made by the bank of the bank's loan loss reserves and internal management controls.  *Shapiro,* 964 F. 2d at 274-275.  Judge Scirica, writing for the Court, opined that there is "nothing unique about representations...regarding loan loss reserves that removes them from the purview...of the federal securities laws."  *Id.* at 281.  Knowledge  that a company (there a bank) deliberately hid its financial status by failing to provide adequate loss reserves could significantly affect the behavior of a reasonable investor.  *Id.*  A company cannot characterize loss reserves as adequate or solid when it knows that the reserves are inadequate or unstable.  *Id.*  When a company addresses the quality of a management practice, that representation becomes material to the reasonable shareholder.  *Id.*  At that time, the company must speak truthfully about the subject. *Id.*  The PMA Plaintiffs make the same argument that the Third Circuit considered in *Shapiro.*  PMA represented their loss reserves to be adequate, making those statements material.  If Plaintiffs can prove that any of the PMA Defendants spoke untruthfully about the loss reserves, Plaintiffs are entitled to recover under the Exchange Act. Neither the bespeaks caution doctrine nor the statutory safe harbor provision support Defendants' motion.

Secondly, the PMA Defendants argue that, even if the statements regarding the loss reserves are actionable, Plaintiffs claim should still fail because Plaintiffs have not pleaded any particularized facts to support the notion that the Defendants "knowingly or recklessly" failed to set adequate reserve levels for PMA Re. PMA Def.'s Mem. at 46. Plaintiffs do not allege that PMA merely failed to set loss reserves. Plaintiffs claim that Defendants misrepresented the way they set the loss reserves and the adequacy of those reserves, thereby harming shareholders. If true, this misrepresentation is a violation of the Exchange Act because Defendants had a duty to replace the misleading information with truthful material. *Shapiro,* 964 F. 2d at 281. Thus, Defendants' motion to dismiss the PMA Re claims relating to loss reserves is denied.

**b. Alleged Underpricing**

The claims based on PMA Re underpricing are sufficiently plead to survive the motion to dismiss. Here, the PMA Defendants reason that all claims based on the alleged "underpricing" at PMA Re should be dismissed because Plaintiffs fail to identify any specific false statements regarding underpricing or any facts that show actual underpricing. PMA Def.'s Mem. at 55. Consequently, Plaintiffs cannot link any injury to the alleged underpricing at PMA Re. *Id.* However, Defendants mischaracterize the claim in the Amended Complaint. Plaintiffs do not claim that the underpricing violated the Exchange Act; Plaintiffs' cause of action involves the alleged *misrepresentation* of the PMA insurance pricing. *See* Am. Compl. ¶¶ 4, 8, 56-58, 61. Defendants were obligated to speak truthfully when addressing the way in which they priced insurance coverage. *Shapiro,* 964 F. 2d at 281. Therefore, Defendants' motion to dismiss Plaintiffs' underpricing claim is denied.

**2. Claims Relating to Caliber One**

Next, Plaintiffs bring claims addressing the PMA Defendants' operation of Caliber One. Specifically, Plaintiffs aver that the PMA Defendants underpriced, under-reserved and eventually terminated Caliber One and that alleged mismanagement was hidden from investors through what Plaintiffs characterize as misleading statements both to the press and the SEC. Defendants contend that all claims based on Caliber One should be dismissed because they are barred by the statute of limitations, and they are legally deficient on the merits. Therefore, the Court considers whether Plaintiffs can state a claim for fraud based on the Caliber One evidence, and if so, is that claim timely.

**a. Statute of Limitations**

The PMA Defendants allege that the Caliber One claims are time-barred as of May 2004. PMA Def.'s Mem. at 56-58. The statute of limitations on a Rule 10b-5 claim is two years after the discovery of facts constituting the violation. 28 U.S.C. § 1658(b). The PMA Defendants contend that the limitations period began to run as early as May 2002 because all of the investors were on "inquiry notice," of the facts forming the basis of the alleged violations. *See* Am. Compl. ¶139. Plaintiffs do not plead one allegation relating to Caliber One after May 2002. Therefore, according to Defendants, Plaintiffs knew the claims as of May 1, 2002 and had two years from that date to file. The original complaint in this matter never mentioned the Caliber One claims. The first time Plaintiffs asserted Caliber One claims was in the Amended Complaint (filed on September 20, 2004), which Defendants assert was after the limitations period. Plaintiffs respond by claiming that they did not have inquiry notice of the alleged fraud within the statutory time period, and therefore, the statute has not run. Pl.'s Mem. at 25-29. Alternatively, Plaintiffs invoke the relation back doctrine,

which would permit the allegations in the Amended Complaint to relate back to the date of the original filing.  Fed. R. Civ. P. 15(c)); Pl.'s Mem. at 29-30.

Shareholders have inquiry notice of an Exchange Act claim if they discover, or in the exercise of reasonable diligence, should have discovered the basis for that claim.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002) (citations omitted).  The test for inquiry notice is objective.  *Id.*  Whether the plaintiffs should have known about their claim "in the exercise of reasonable diligence" depends on whether they had "sufficient information ...to excite 'storm warnings' of culpable activity."  *Id.*  If a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning, that investor will be said to be on inquiry notice.  *Id.*  Plaintiffs do not need to know all of the details of the alleged fraud.  *Id.* at 1326. The limitations period will begin to run when the plaintiffs should have discovered the "general fraudulent scheme."  *Id*. (citations  omitted).

It appears, from the face of the Amended Complaint, that Plaintiffs were on inquiry notice of the Caliber One claims as of May 1, 2002.  All of the facts relating to the Caliber One complaint occurred before May 1, 2002.  The May 2001 press release, which reported first quarter 2001 results, announced that PMA was withdrawing from Caliber One's excess and surplus lines of business because of "uncertainty associated with Caliber One's operations.  Am. Compl. ¶ 139.  PMA also announced that it needed to increase Caliber One's loss reserves by $40 million and that it had a net loss of $17.2 million for the first quarter of 2002.  *Id.*  In a conference call following the May 2002 press release, PMA   indicated, among other things, that the "pre '01 underwriting was not good" and there were "a number of sub-classes that have relatively small premium levels."  *Id.*  Given this

information, the Plaintiffs certainly should have been aware of any improper conduct regarding the Caliber One business entity.

Nonetheless, the Court believes that the claims should relate back under Fed. R. Civ. P. 15(c). An amended pleading relates back to the date of original pleading if the claim asserted in the amendment "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c). The Caliber One allegations clearly meet this standard. The original complaint alleged materially false and misleading statements regarding PMA's methods of setting loss reserves. The Amended Complaint makes the same allegations, but adds information specific to a business segment - Caliber One. The conduct in both Complaints (the misrepresentation of loss reserves) overlaps. Therefore, the Court will allow Plaintiffs to amend their complaint to include the Caliber One claims.

**b. Sufficiency of the Caliber One Claims**

Alternatively, Defendants contend that even if the claims are not time barred, the Court should dismiss them on the merits. First, Defendants submit that the Caliber One claims should be dismissed because the crux of Plaintiffs' claims is mismanagement, which is not actionable under the Exchange Act. PMA Def.'s Mem. at 58. The Court would agree with the Defendants if Plaintiffs' claims were based on mismanagement. However, Plaintiffs have plead more than mere mismanagement. Throughout the Amended Complaint, Plaintiffs allege that Defendants' *statements* about the management of Caliber One are misleading. *See* Am. Compl. ¶¶ 105, 118, 120, 122, 137. Such facts, if true, certainly give rise to a fraud claim because as stated above, PMA had a duty to speak truthfully about their management practices. *See Shapiro,* 964 F. 2d at 281-82. Defendants

motion to dismiss the claims against Caliber One are denied.

### 3. Claims Relating to PMA Insurance Group

Plaintiffs claim that in November 2003Defendants issued two press releases that contained false and misleading statements concerning loss reserves at PMA Insurance Group.  Defendants indicated that "no reserve adjustments were necessary."  Am. Compl. ¶¶ 176, 184; Pl.'s Mem. at 38. However, Plaintiffs argue that the February 11, 2004 press release highlighted that PMA Insurance Group reserve studies required PMA to increase loss reserves by $50 million.  Am. Compl. ¶ 188. The PMA Defendants move for dismissal of all claims relating to the Insurance Group because the alleged misrepresentations, statements claiming that no reserve adjustments were necessary, are immaterial as a matter of law and no facts were pleaded to support the claim.  Consequently, the Court considers whether the PMA Insurance statements negatively affected investors and rose to the level of securities fraud.

To recover under the Exchange Act, Plaintiffs must prove that they relied on the statements made by the Defendants.  *GSC Partner*, 368 F. 3d at 236(citation omitted).  To establish reliance, Plaintiffs plead their Exchange Act claims under the "fraud on the market theory."  *See* Am. Compl. ¶¶ 193-194.  The "fraud on the market" theory accords plaintiffs in Rule 10b-5 class actions a rebuttable presumption of reliance if plaintiffs bought or sold their securities in an "efficient" market. *Burlington,* 114 F.3d at 1419. Plaintiffs pleading fraud on the market need not show that they actually knew of the communication that contained the alleged misrepresentation. *Id.*  Plaintiffs are accorded the presumption of reliance based on the theory that in an efficient market, misinformation directly affects stock prices and causes injury even in the absence of direct reliance.  *Id.*  Plaintiffs still must establish that the fact at issue is material. *Burlington,* 114 F. 3d at 1417. However, the

PMA Defendants allege that the misrepresentations regarding PMA Insurance Group are immaterial as a matter of law when applying the "market check" test because the information in the February 11, 2004 announcement did not negatively impact PMA's stock price.[7] PMA Def.'s Mem. at 63-66.

The "market check test" acts as a defense to Exchange Act claims plead under the fraud on the market theory. Consequently, a misrepresentation is immaterial, as a matter of law, if a subsequent disclosure of the alleged misrepresentation has no appreciable negative impact on the stock price at issue. *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (finding that defendant corporation's statements regarding the inconclusiveness of the relationship between its weight-loss drugs and heart-valve disorders were immaterial for 10b-5 purposes because the statements had no appreciable negative effect on the company's stock); *Burlington,* 114 F. 3d at 1425 ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."); *NAHC*, 306 F.3d at 1330.

Plaintiffs' claims regarding PMA Insurance Group do not pass the "market check" test. Here, when PMA announced on February 11, 2004 that it was increasing its reserves for PMA Insurance Group, its stock prices went up, not down. In fact, the stock price increased by 12%, and the next day, it increased an additional 22% - a total of over 34%. *See* PMA Def.'s Mem. Exhibit 34. Plaintiffs argue that the movement of the PMA stock must be viewed in connection with industry and market forces. Pl.'s Mem. at 39. However, Plaintiffs offer no case law to support their position. In fact, Third Circuit precedent is clear. Information that does not affect the price of stock in an

---

[7]Defendants also argue that, the bespeaks caution doctrine is applicable to these statements. The Defendants again argue that reserve levels are forward looking by their nature and that the statements were accompanied by cautionary language. *See* Def.'s Mem. at 66 for the cautionary language accompanying these statements. Again, the Court rejects this argument.

efficient market is immaterial. Plaintiffs may not state an Exchange Act claim from facts arising out of the alleged misconduct with the PMA Insurance Group because such information had no negative effect on PMA stock. Defendants' motion to dismiss the PMA Insurance Group claims is granted.

**4. Claims Based on PMA Internal Controls and Financial Statements**

In this section of the Amended Complaint, Plaintiffs focus on general PMA allegations. Plaintiffs contend that statements about PMA internal controls and financial conditions were misleading and actionable under the Exchange Act because PMA did not disclose their inadequate internal controls or clarify their misleading financial statements. *See* Am. Compl. ¶¶ 81-92. Defendants argue that all claims based on internal controls and financial statements must be dismissed as immaterial. PMA Def.'s Mem. at 68-72. The Court must consider whether statements pertaining to internal controls and financial statements are material for purposes of fraud under the Exchange Act.

The internal control statements are actionable. Defendants' main argument regarding the internal controls allegations is based exclusively on an attachment to a PwC letter to management commenting on one technical aspect of PMA Re's businesses.[8] Am. Compl. ¶82; PMA Def.'s Mem. at 69. According to Defendants, this comment has nothing to do with PMA's underwriting or loss reserves; it constitutes at most a suggestion for improving the skills of certain staff at PMA Re. *Id.* Additionally, the Sarbanes-Oxley certifications Plaintiffs refer to do not relate to underwriting and reserve controls. Am. Compl. ¶¶153, 157, 167, 173; PMA Def.'s Mem. at 70. The Court disagrees

---

[8] PMA Defendants also argue that it is not a violation of securities laws to fail to provide sufficient internal controls. *Id.* at 69. The Court agrees. However, it is a violation of securities laws to fail to disclose the true facts regarding the adequacy of your internal controls, as alleged in the Amended Complaint. *See Shapiro,* 964 F. 2d at 281-282.

with the PMA Defendants. The PwC report highlights internal control deficiencies that affected the setting of loss reserves, making it material. Am. Compl. ¶ 82. Furthermore, the PwC report indicated that the identified internal control deficiencies resulted in several adjustments. *Id.* The Sarbanes-Oxley certifications are relevant because the Defendants claimed therein that all internal control deficiencies had been disclosed.

The financial statements are also actionable. An allegation that a company misrepresents whether loss reserves were set in accordance with GAAP is actionable under the Exchange Act. *See Burlington,* 114 F. 3d at 1420-1421. PMA Defendants also seek the dismissal of the claims based on the financial statements. PMA Def.'s Mem. at 71-72. The crux of the Plaintiffs' argument, is that PMA issued false financial statements because Defendants represented that the statements were prepared in accordance with GAAP, when in fact they were not because the loss reserves were understated and mislead investors. Once again, Defendants contend that an increase in a company's reserves does not give rise to a securities violation. PMA Def.'s Mem. at 71-72. Again, Defendants misstate Plaintiffs' position. PMA reported that its financial statements were prepared in accordance with GAAP. Plaintiffs claim that such statements were materially false because PMA understated loss reserves and failed to maintain adequate internal controls. This is a well plead Exchange Act violation because, if true, it would mean that PMA underestimated their liabilities and expenses. *See Burlington,* 114 F. 3d at 1420-1421 (allowing shareholders to state an Exchange Act claim when Plaintiffs accused the company of manipulating financial statements using accountings principles in violation of GAAP thereby creating materially misleading earnings overstatements). Defendants motion is denied.

**5. Scienter**

Next, PMA indicates that Plaintiffs did not sufficiently plead scienter, and therefore, the 10b-5 claims should be dismissed.  Scienter is the intent to deceive, manipulate or defraud.  *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976).  The PSLRA establishes pleading standards for scienter in 10b-5 claims.  *See GSC Partners*, 368 F.3d at 237.   A plaintiff must state with particularity facts giving rise to a strong inference that the defendant acted with scienter.  15 U.S.C. §78u-4(b)(2); *NAHC*, 306 F.3d at 1328.  This requirement supercedes the requirement of Fed. R. Civ. P. 9(b), which allows plaintiffs to generally aver the state of mind in fraud cases.  *Id.*  Plaintiffs have two ways to satisfy this burden in the Third Circuit; a plaintiff can either show a defendant had both motive and opportunity to commit the fraud, or submit  strong circumstantial evidence of conscious misbehavior or recklessness.  *GSC Partners*, 368 F.3d at 237.

The Court agrees with the PMA Defendants that Plaintiffs failed to plead motive with particularity.  The Third Circuit has held that allegations regarding a defendant's motivation to facilitate public offerings as legally insufficient to establish a strong inference of scienter.  *GSC Partners*, 368 F.3d at 237-38.  The facilitation of a public offering is a generalized motive because all public companies, by their very nature, hold public offerings.  *Id.*  Every corporate transaction is motivated by the desire to complete that transaction for financial benefit.  *Id.*  Additionally, the allegation that the Defendants wanted to double the size of PMA's business is also legally deficient because Plaintiffs have failed to plead circumstances of the alleged motive with any detail.  *See* Am. Compl. ¶59.  The allegations that the Defendants engaged in fraud to facilitate the completion of public offerings cannot state a claim for fraud under 10b-5.

On the other hand, Plaintiffs have successfully plead circumstantial evidence of recklessness.

The PMA Defendants contend that Plaintiffs have not alleged one fact demonstrating Defendants' knowledge of facts or access to information contradicting their public statements. PMA Def.'s Mem. at 76-77. A reckless statement is a material misrepresentation or omission involving an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers. *GSC Partners*, 368 F.3d at 239 (quotations omitted). The danger of misleading must be either known to the defendant or is so obvious that the defendant must have been aware of the danger. *Id.* In the Amended Complaint, Plaintiffs plead the following facts: 1) Caliber One underpriced its business (¶¶ 62-66), 2) Defendants disregarded that PMA recorded much less conservative loss reserves in the face of more competitive insurance market conditions (¶ 68), 3) that the substantial loss reserve shortfalls identified by Deloitte and E&Y were material and identified using the same information available to PMA (¶¶ 71-74, 76), 4) that PMA received a report from PwC regarding deficiencies in internal controls and made undisclosed efforts to correct these deficiencies (¶¶ 79-83) and 5) identification of PMA's insufficient loss reserves led to the termination of PwC (¶¶ 69-70). Pl.'s Mem. at 46-53. Read together, these facts successfully meet the strict pleading requirements of the PSLRA for scienter. Defendants' motion to dismiss for lack of scienter is denied.

**6. Section 20 Claim**

The PMA Defendants' final Exchange Act arguments involves § 20. Section 20 holds controlling persons responsible for violations of the Exchange Act. *Trump,* 7 F. 3d at 366. Based on the arguments above, Defendants contend that Plaintiff have not made a primary claim under Rule 10b-5, therefore, a § 20 claim, which is predicated upon an underlying violation of the Exchange Act, must also be dismissed. The Court disagrees. As discussed above, Plaintiffs have sufficiently plead § 10(b) claims based on PMA Re, Caliber One, PMA internal controls and financial

statements. Defendants do not claim that any of the individual PMA Defendants are not "controlling persons" under § 20. Therefore, the § 20(a) claim should survive for all issues involving PMA Re, Caliber One, PMA Internal Controls and PMA Financial Statements. The PMA Defendants' motion to dismiss the § 20 claim is denied as to the surviving Exchange Act claims.

**B. Defendant McDonnell's Motion to Dismiss**

Defendant McDonnell has moved separately for dismissal of all claims against him based on the Exchange Act. Plaintiffs claim that as CFO of PMA for the first three years of the class period, Defendant McDonnell, was directly responsible for the preparation and dissemination of materially false and misleading financial reports. Pl.'s McDonnell Mem. at 1. These reports contained financial statements, which according to Plaintiffs, led to shareholder misinformation. McDonnell moves to dismiss, claiming that Plaintiffs have failed to properly plead or meet the Exchange Act elements as they apply to his actions at PMA.[9]

**1. Fed. R. Civ. 9(b) & PSLRA**

McDonnell argues that Plaintiffs have not meet the pleading standards for securities fraud under the Exchange Act as outlined by the PSLRA. McDonnell claims that Plaintiffs have failed to allege 1) how the misstatements were material or false, 2) that McDonnell knew the statements were false or 3) that McDonnell acted with scienter. McDonnell's Mem. at 3. Based on the reasoning noted above, Plaintiffs have met the pleading standards of the PSLRA. Loss reserves are liabilities

---

[9] In addition to the claims discussed below, McDonnell also repeats the arguments of the PMA Defendants. McDonnell argues 1) that the statements involving loss reserves are forward looking and non-actionable, 2) that the loss reserves statements qualify for protection under the bespeaks caution doctrine and PSLRA safe harbor, 3) Plaintiffs did not plead that the statements at issue were false when made, 4) that the financial statements are not prepared according to GAAP are not actionable , and 5) the statements he made were true or at most puffery. McDonnell's Mem. at 7-21. There is no need for the Court to go into these arguments because of the rulings in the PMA Defendants' motion. McDonnell's arguments are rejected.

for accounting purposes. Therefore, a reasonable investor could be significantly influenced by the fact that a company has deliberately hidden its financial status by failing to provide adequate loss reserves. *Shapiro,* 964 F. 2d at 281. If a company characterizes loss reserves as adequate or solid when it knows that the reserves are inadequate or unstable, such a characterization gives rise to an Exchange Act claim. *Id.* As CFO, McDonnell characterized PMA's loss reserves as adequate and like the PMA Defendants, can be held liable.

**2. Group Pleading Under the PSLRA**

The PSLRA imposes strict pleading standards, which McDonnell argues, Plaintiffs fail to meet. The group pleading doctrine allows allegations that misstatements contained in company documents (such as press releases and SEC filings) are presumed to be the collective work of that company's directors and officers. *In re U.S. Interactive, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 16009 (E.D. Pa. 2002). According to McDonnell, the PSLRA eliminated the group pleading doctrine as inconsistent with its heightened pleading standards. McDonnell's Mem. at 5. Therefore, the Plaintiffs should not be able to lump together Defendants, making broad statements, but rather, must set forth with particularity each Defendant and plead scienter as to each Defendant. *Id.* at 7. The Third Circuit has not yet decided this issue, and the district courts in this circuit are split. *See U.S. Interactive,* 2002 U.S. Dist. LEXIS at 15 (*comparing Marra v. Tel-Save Holdings, Inc.,* 1999 U.S. Dist. LEXIS 7303 (E.D. Pa. May 18, 1999) (holding that the continued vitality of the group pleading doctrine is suspect) *with In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 949 (E.D. Pa. 1999) (analyzing the liability of an outside director using the group pleading doctrine). However, the Court does not have to opine on the survival of the group pleading doctrine because Plaintiffs' claims against McDonnell rely on documents he personally signed as CFO of PMA. Pl.'s Mem.

at 12-13. Additionally, the Amended Complaint alleges that McDonnell personally set published loss reserves. Am. Compl. ¶ 75. His liability does not rely on group pleading because he is being accused individually of his own alleged violations of the Exchange Act.

**3. Scienter**

Like the PMA Defendants, McDonnell claims that the Plaintiffs have failed to adequately plead scienter. McDonnell claims that the facts Plaintiffs use to establish scienter are too generalized to meet the requirements of the PSLRA. McDonnell's Mem. at 25-26. In fact, McDonnell reasons that the allegations in the complaint actually negate any inference of scienter because the loss reserves were estimates made by actuaries, and there is no evidence that he disregarded their advice. *Id*. at 26-27. The Court finds McDonnell's arguments here unpersuasive.

In order to plead scienter, a plaintiff can either show a defendant had both motive and opportunity to commit the fraud, or submit strong circumstantial evidence of conscious misbehavior or recklessness. *GSC Partners*, 368 F.3d at 237. Here, Plaintiffs have shown that strong circumstantial evidence exists on the face of the complaint to meet the scienter requirement. Specifically, Plaintiffs allege in the Amended Complaint that McDonnell 1) disregarded that Caliber One underpriced its business (¶¶ 62-66), 2) disregarded that PMA recorded much less conservative loss reserves in the face of more competitive insurance market conditions (¶ 68), 3) knew that the substantial loss revenue shortfalls identified by Deloitte and E&Y were material and identified using the same information available and known at the time the reserves were established (¶¶ 71-74, 76), and 4) caused the termination of PwC for identifying PMA's insufficient loss reserves (¶¶ 69-70). Read together, these facts successfully meet the strict pleading requirements of the PSLRA for scienter. McDonnell's motions to dismiss for lack of scienter is denied.

**4. Section 20(a) Claim**

McDonnell also moves to dismiss the § 20 claim.  Section 20 holds controlling persons responsible for violations of the Exchange Act. *Trump,* 7 F. 3d at 366.  McDonnell is a controlling person as defined by § 20, as one that "induces the act...constituting the violation." 15 U.S.C. § 77o.  As CFO, McDonnell signed PMA's financial statements, which (according to the § 11 and § 12 claims) violated the Exchange Act by misleading investors about the setting of loss reserves and PMA's financial status.  Because the underlying Exchange Act claims survived, the Court finds that Plaintiffs can state a § 20 claim against Defendant McDonnell.  McDonnell's motion to dismiss the § 20 claim is denied.

### IV. THE SECURITIES ACT CLAIMS

The Court now considers the Securities Act allegations, which Plaintiffs set forth in paragraphs 212-219 of the Amended Complaint.  Counts III, IV and V are Securities Act claims, based on three PMA public offerings of PMA securities.  Plaintiffs bring Count III pursuant to § 11 of the Securities Act, 15 U.S.C.  § 77k(a),  against all Securities Act Defendants.  Plaintiffs bring Count IV pursuant to § 12 of the Securities Act, 15 U.S.C. § 77l(a)(2),  against PMA, Trusts I and II and the underwriters.  Finally, Plaintiffs bring Count V against the individual Securities Act Defendants pursuant to § 15 of the Securities Act. According to Plaintiffs, both Defendant PMA and the Individual PMA Defendants contributed to the information published in connection with the offerings.  All Securities Act Defendants filed motions to dismiss Plaintiffs Securities Act claims. The PMA Defendants filed one motion joined by the members of its board of directors as well as the Trusts. Francis McDonnell, who was the former CFO and treasurer of PMA until his resignation in 2002, has filed a separate motion to dismiss.  Sandler and O'Neill, one of the underwriters, has also

filed a motion. BOA and CSFB, have filed a joint motion. Underwriter FBW also filed its own motion to dismiss. McDonnell and the Underwriters joined in the arguments of the PMA Defendants.

To state a claim under § 11 of the Securities Act, Plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement. *In re Adams Golf Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004). To state a claim under § 12, Plaintiffs must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication. *Id*. Section 15 imposes liability on controlling persons for violations of §§ 11 and 12. There must be an underlying violation of §§ 11 or 12 to have a viable § 15 claim. *See* 15 U.S.C. § 77o. The bespeaks caution doctrine also applies to Securities Act violations. Consequently, statements involving a public offering are deemed immaterial, as a matter of law, if they are forward looking and accompanied by specific warnings or cautionary language advising investors of the risks or uncertainties inherent in the prediction or estimate. *See, e.g. Adams Golf*, 381 F.3d at 279; *Trump*, 7 F.3d at 371-72.

### A. The PMA Defendants' Motions to Dismiss[10]

Plaintiffs accuse the PMA Defendants of making false statements in connection with the three public offerings discussed above. PMA made all three offerings pursuant to a registration statement and prospectus. The Common Stock Offering registration statement stated that PMA's financial results were presented according to GAAP and that the loss reserves were fairly stated as of September 30, 2001. Am. Compl. ¶ 214; Pl.'s Mem. at 4. The registration statement also indicated that PMA had disciplined underwriting and underwriting and actuarial expertise. *Id*. The

---

[10] The Underwriters joined in these arguments as well. *See* Sandler Mem. at 3; FBW Mem. at 5; CSFB Mem. at 6.

Senior Notes Offering and Debentures Offering shared the same registration statement and prospectus.[11] Am. Compl. ¶ 219.   Within the registration and prospectus, Defendants claimed that PMA presented their financial results in accordance with GAAP and fairly stated their loss reserves. The Debentures Offering also included a prospectus supplement, which indicated that PMA presented their financial results in accordance with GAAP.  As with the Exchange Act claims, the PMA Defendants argue that the statements at issue are not material and therefore cannot give rise to a Securities Act violation.  Therefore, the Court must decide whether the statements Defendants made in connection to the PMA public offerings are actionable under the Securities Act.

## 1.  Claims Based on the Loss Reserves Statements

Plaintiffs bring their first Securities Act claim for statements Defendants made about the adequacy of PMA loss reserves.  Defendants published these statements in the Common Stock Registration Statement, the Debentures Prospectus and the Senior Notes Prospectus.  Throughout their motion to dismiss, the PMA Defendants argue that their statements about loss reserves are not actionable because the statements are immaterial as a matter of law.  PMA Def.'s Mem. at 27-38. Hence, this Court must decide whether the statements regarding the adequacy of loan loss reserves were materially misleading.

PMA submits that the management's belief that loss reserves were "fairly stated" does not give rise to a claim under the Securities Act.  PMA Def.'s Mem. at 26.  Defendants again argue that the bespeaks caution doctrine applies to this statement because statements of insurance loss reserves are estimates or predictions of the amounts that may be needed to pay future claims, and are

---

[11] PMA made the Debenture Offering and the Senior Notes Offering pursuant to a shelf registration statement.  Am. Compl. ¶ 219. A shelf registration statement allows a company to offer certain securities at various points in time pursuant to a single previously effective registration statement.  Am. Compl. ¶ 216.

therefore, by definition, "forward looking." *Id.* at 29-36. Once again, the Court addresses the question of whether loss reserve statements are forward looking, thereby qualifying for protection under the bespeaks caution doctrine and statutory safe harbor provision.

As stated in the Exchange Act discussion *supra*, statements of loss reserves and their adequacy are not per se forward-looking. *See, e.g. Westinghouse,* 90 F. 3d at 709-710 ("a reasonable investor would be very interested in knowing...[that] current reserves were known to be insufficient under current economic conditions."). A company cannot characterize loss reserves as adequate or solid when it knows that the reserves are inadequate or unstable because a reasonable investor could be influenced by a company hiding its financial status by failing to provide adequate loss reserves. *Shapiro,* 964 F. 2d at 274-275. Because the bespeaks caution doctrine only applies to forward looking statements, it cannot be applied here.

Alternatively, Defendants argue that if the bespeaks caution doctrine does not apply, the Plaintiffs have failed to allege any facts that demonstrate that the reserves were not fairly stated, thereby making the statement immaterial. PMA Def.'s Mem. at 37. Defendants reason that the Plaintiffs cannot merely point to a subsequent increase in reserves; there must be a showing that the statements were untrue or misleading at the time the statement was made. *Id.* Claiming that loss reserves were "fairly stated" is actionable if the Defendants set the loss reserves at materially inadequate levels when they made the claim. The fact that PMA had to increase its loss reserves by over $300 million for 1997-2000 is evidence that they may have been understated or incorrect at the time the registration statements and prospectuses were issued. However, Plaintiffs also allege that outside auditors determined the loss reserves to be inadequate as well and were terminated in an effort not to disclose the inadequacy. *See* Am. Compl. ¶¶ 69, 71-74. Plaintiffs plead that PMA knew

the loss reserves were inadequate *at the time of the public offerings*, not after.  Plaintiffs have surely plead enough to satisfy Fed. R. Civ. P. 8.  Defendants' motion to dismiss the loss reserve claims are denied.

**2.  Claims Based on GAAP Statements**

Here, Plaintiffs challenge the statement in the Common Stock Registration Statement and the Debentures Offering Prospectus that the financial results were prepared in "accordance with GAAP."  Am. Compl. ¶ 219.  Defendants assert that the GAAP statement cannot give rise to a Securities Act claim for two reasons.  First, Plaintiffs never allege that the financial results were not presented in accordance with GAAP.  PMA Def.'s Mem. at 39.  Second, even if the financial results did not conform with GAAP, stating that they did is not materially misleading.  *Id.*  Defendants argue that Plaintiffs must plead specific allegations about how the failure to conform with GAAP rendered the financial statements misleading.  Information that a plaintiff contends should have been included in financial statements may appear somewhere else in the SEC filings.  Therefore, a failure to conform with GAAP is immaterial as a matter of law because it is available in the "mix" of information available to investors.

Defendants' position is not consistent with Third Circuit precedent.  Misleading statements regarding GAAP procedures are actionable.  *See Westinghouse*, 90 F. 3d 710.  Whether or not a company sets loss reserves in compliance with GAAP can have "significance to a reasonable investor contemplating the purchase of securities."  *Id.*  Consequently, such statements are misleading and may be actionable under the Securities Act.  Defendants' motion is denied as to the GAAP statements.

**3.  Claims Based on Underwriting and Actuarial Expertise Statements**

Defendants now challenge the claim relating to the "underwriting and actuarial expertise" statement, which PMA published in the Common Stock Offering Registration Statement, Shelf Registration and Senior Note Prospectus. *See* Am. Compl. ¶¶ 214, 216.  Defendants argue that the Plaintiffs have not alleged facts to support the claim that the statement regarding underwriting and actuarial expertise is false.  PMA Def.'s Mem. at 18.  According to Defendants, Plaintiffs' claim is based on the fact that PMA aggressively underpriced insurance coverage, the loss reserves were set at materially inadequate levels and PMA suffered from serious deficiencies in internal controls relating to underwriting of insurance and setting of loss reserves.  *Id.*  Defendants argue that there is no link between the allegations of underpriced insurance, inadequate reserves or lack of internal controls and the lack of underwriting and actuarial expertise.  *Id.*  Furthermore, Defendants argue that the statements regarding underwriting expertise are true because PMA has been in business since 1915, and the company's successful revenues show that they possess underwriting and actuarial expertise.  *Id.* at 18-19.  Alternatively, Defendants argue that the statement is an opinion and therefore immaterial as a matter of law.  *Id.* at 20.  Rather, Defendants argue that the statement is mere puffery and optimism because a generic corporate assertion of "expertise" is too vague and subjective to be material.  *Id.*  As such, Defendants reason that courts routinely dismiss Securities Act claims based on statements such as the one in dispute because such statements would not have value to a reasonable investor.

In contrast, this Court finds that the statement claiming "underwriting and actuarial expertise" is actionable.  In the Amended Complaint, Plaintiffs allege that Defendants mislead investors by failing to disclose certain material facts to investors.  According to Plaintiffs, those facts were

necessary to avoid misleading investors about PMA's underwriting capabilities because PMA had a series of internal control deficiencies, which led to understated loss reserves. Am. Compl. ¶¶ 81-82; Pl.'s Mem. at 14. Such facts are sufficient to state a claim under the Securities Act. If a company addresses the quality of a management practice, that company determines such representations to be material and is bound to speak truthfully about that practice. *Shapiro,* 964 F. 2d at 282. *See also Kline v. First W. Gov't Sec.,* 24 F. 3d 480, 491 (3d Cir. 1994), *rehearing en banc denied*, 1994 U.S. App. LEXIS 13306 (3d Cir. 1994) (finding a duty to disclose when a public opinion could mislead third parties). By making the statement, Defendants made the subject of their underwriting and actuarial performance material. It is not necessary for Plaintiffs to demonstrate that Defendants had *no* underwriting and actuarial expertise, as Defendants suggest. Rather, it is only necessary to plead that the statements were materially inadequate when made and that Defendants did not supplement the information. To avoid misleading investors, Defendants could have, for example, disclosed their control deficiencies and the level of their loss reserves. Such information was certainly material to an understanding of underwriting and the failure to disclose it in this case clearly states a claim under the Securities Act. Defendants' motion here is denied as to underwriting and actuarial expertise statements.

**4. Claims Based on Disciplined Underwriting Statement**

With respect to the statement concerning "disciplined underwriting," Defendants make two arguments. First, Defendants submit that the statement was an immaterial observation that does not rise to the level of actionable puffery and no reasonable investor would expect an insurance company to say otherwise. PMA Def.'s Mem. at 22. Alternatively, Defendants argue that even if the statement was material, Plaintiffs have not alleged that the statement was false when made, nor have

they alleged any facts that would support such a conclusion. *Id.* at 22-23, 43. Furthermore, Defendants submit that the statement is in fact true because the reinsurance segment of the business had been in operation for more than 30 years. *Id.* at 43-44. Plaintiffs only allege that PMA aggressively underpriced insurance coverage, which Defendants argue does not establish a lack of discipline. *Id.* But Defendants argument fails here as well. Like the first business statement, Plaintiffs have sufficiently plead that the "disciplined underwriting" statement was materially incorrect when made and is therefore actionable under the Securities Act. PMA allegedly underpriced its insurance policies at rates of 70-90% below market rates. Am. Compl. ¶139. This tactic, if true, would illustrate that PMA was not maintaining disciplined underwriting as is alleged in the Amended Complaint. *Id.* Defendants should have disclosed this information to investors as well. *Shapiro,* 964 F. 2d at 282. Defendants' motion to dismiss the claims based on the disciplined underwriting statements is denied.

**5. Claims Based on Experienced Senior Management and Underwriting Statement**

Regarding the third statement, "PMA had experienced senior management and underwriting teams in place," Defendants contend that this statement is not actionable because: 1) the Plaintiffs have not alleged that the management and underwriting teams lacked the experience that PMA described them as having, 2) the Plaintiffs have not alleged any facts to support the claim that PMA lacked experienced senior management and underwriting teams, and 3) the statement is an immaterial characterization. PMA Def.'s Mem. at 24-25. Defendants also argue that this statement is true. *Id.* at 25. Nonetheless, the Court finds the statement that PMA has "experienced senior management and underwriting teams" is actionable. The Defendants tied the characterization of PMA's staff to an ability to confront problems in the insurance market, but did not disclose that it

was confronting the market through alleged high-risk behavior such as underpricing and low and inadequate loss reserves. If PMA's decisions were unreasonable, they had a duty to disclose this to investors before the investors assumed the risk of PMA's managements practices. *See Shapiro*, 964 F. 2d at 282. Defendants' motion to dismiss the Securities Act claims pertaining to management and underwriting experience is denied.

**6. Standing to Pursue Claims Based on the Debenture Offering Prospectus**

Defendants make one additional argument in their motion to dismiss the claims based on the Debenture Offering. Defendants suggest that Plaintiffs lack standing to pursue this claim.[12] PMA Def.'s Mem. at 45. Sections 11 and 12 only provide relief to those who were misled in connection with securities that they purchased. *See* 15 U.S.C.A. §§77k(a) and 77l(a). None of the named Plaintiffs purchased Senior Debentures. Therefore, Defendants contend that Plaintiffs do not have standing to sue for claims related to this offering and the claim should be dismissed under Fed. R. Civ. P. 12(b)(1).

Nonetheless, the Court finds that Plaintiffs do have standing to pursue the §§11 and 12 claims for the Senior Debentures. Lead Plaintiffs may pursue claims on behalf of the entire class because they were appointed to oversee litigation on behalf of the class. The PSLRA does not require that the lead Plaintiffs have standing to sue on every available cause of action. *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) (refusing to adopt a *per se* rule that district courts must choose a lead plaintiff with standing to sue on every available cause of action because the PSLRA requires courts to choose a party who has the largest financial stake in the outcome of the case). Here, the lead Plaintiffs are especially capable of representing the interests of Plaintiffs who

---

[12] Defendants CSFB and BOA also make this argument. CSFB Mem. at 7.

purchased the Senior Debentures because they purchased the Senior Notes, which were offered pursuant to the same registration statement and allege the same incorrect statements and violations.[13] Defendants' motion to dismiss due to lack of standing is denied.

**7. Section 15 Claims**

Based on the arguments made above, Defendants assert that Plaintiffs are not able to make out a viable § 11 or § 12 claim. To impose liability on individual control persons, Plaintiffs must first establish a valid § 11 or § 12 claim. *Klein v. Gen. Nutrition Cos*., 186 F.3d 338, 344 (3d Cir. 1999). Here, Plaintiffs' claims under §15 will be sustained because the §§11 and 12(a)(2) claims were properly pleaded and therefore, there is an underlying violation for which to sustain the §15 claims.

**B. The Underwriters' Arguments**

The underwriters of the offerings move for dismissal separately. Under the Securities Act, underwriters of public offerings are also liable for material misstatements. Although each underwriter incorporates the arguments of the Defendants above, special reference is made below to the underwriters' arguments that pertain specifically to each.

**1. Sandler O'Neill**

Defendant Sander O'Neill argues that the claims based on the Debenture Offering should be dismissed because: 1) three of the statements involved immaterial "puffery," 2) Plaintiffs have plead no facts to support that the statements were false and 3) none of the named Plaintiffs purchased

---

[13]Alternatively, Defendants argue that even if the Plaintiffs did have standing, their claim would fail for the same reasons that the other statement pertaining to GAAP does. However, the Court has already ruled that statements pertaining to GAAP methods are actionable.

securities in that offering. Sandler Mem. at 2-3. The Court has already addressed these arguments above. Sandler O'Neill's motion is denied.

## 2. Ferris, Baker and Watts ("FBW")

FBW was the underwriter for only the Notes Offering and argues that it cannot be held liable for violations with respect to the other two offerings. FBW Mem. at 5. FBW argues that the pleadings do not conform with Fed. R. Civ. P. 8(a) because the complaint fails to differentiate among Defendants or allege which Defendants are responsible for which offering. Therefore, the claims against FBW based on the 2001 and 2002 offerings should be dismissed. The Court agrees. Any claims against Defendant FBW for the Common Stock Offering and the Debentures Offering are dismissed with prejudice.[14]

## 3. Credit Suisse First Boston ("CSFB") and Bank of America ("BOA")

CSFB and BOA were the underwriters for two of the three offerings, the Common Stock Offering and the Debentures Offering. They assert that they did not underwrite the Senior Notes Offering and therefore cannot be liable for statements made in connection with that offering. CSFB Mem. at 6. The Court agrees. CSFB and BOA can only be liable for the Common Stock Offering and the Debentures Offering. The motion to dismiss claims against CSFB and BOA involving the Senior Notes Offering is granted.[15]

---

[14]  In their brief, FBW also reasons that the Amended Complaint fails to identify any materially false or misleading statements made in connection with the 2003 offering. These objections are addressed and denied above.

[15]Similar to the other Defendants, CSFB and BOA argue the Plaintiffs have not sufficiently plead any misleading statements actionable under the Securities Act. CSFB Mem. at 10-13. The Court has addressed these arguments above. This motion is denied.

**C. McDonnell's Arguments**

Plaintiffs seek to hold McDonnell liable under the Securities Act. Similar to the underwriters, Francis McDonnell filed a separate motion to dismiss based on defenses that apply only to him. Those arguments are outlined below.[16]

**1. Plaintiffs' Claims are Overbroad**

McDonnell submits that Plaintiffs have improperly asserted claims against him for documents filed after he resigned from PMA and therefore, did not sign. McDonnell's Mem. at 29. To be liable under §§ 11 and 12, an officer must sign the registration statement. 15 U.S.C. §§77k(a)(1) and 77l(a)(2). Of the four documents that allegedly contained misleading statements, PMA only filed one before McDonnell's resignation on June 30, 2002 - the registration and prospectus for the Common Stock Offering. Plaintiffs concede this in their Memorandum in Opposition. Pl.'s Mem. at 33 fn. 17. Therefore, the claims against McDonnell for statements contained in the Shelf Registration Statement, the Debenture Shelf Registration Statement and Senior Notes Shelf Registration Statement are dismissed. The Amended Complaint still states claims under §§ 11 and 12 for statements contained in the Common Stock Offering registration and prospectus.

**2. Statute of Limitations**

Next, Defendant McDonnell asserts that the statutes of limitations for both the §11 and §12 claims have expired. McDonnell's Mem. at 38-39. The statute of limitations for claims under both §11 and §12 is one year after the discovery of the untrue statement or omission, or after such

---

[16] McDonnell also argues that the statements at issue in the Securities Act claims are not actionable. McDonnell Mem at 31-38. However, the Court has already addressed the materiality of the statements in the discussion above, and it is not necessary to repeat that analysis. McDonnell's claims here are denied.

discovery should have been made by the exercise of reasonable diligence.  15 U.S.C. § 77m. Plaintiffs' claims involving the Common Stock Registration Statement only allege that two statements were false: PMA had "underwriting and actuarial expertise" and that it maintained "disciplined underwriting."  Am. Compl. ¶215.  According to McDonnell, these allegations relate only to Caliber One, which is the only business that the Plaintiffs allege had faulty underwriting. Am. Compl. ¶¶62, 66, 80.  On May 1, 2002, PMA announced a decision to withdraw from the Caliber One excess and surplus lines of business to remove uncertainty associated with the segment's operations from PMA's future operating results.  Am. Compl. ¶139.  PMA also announced on that date that it needed to increase the loss reserves for Caliber One by $40 million.  Furthermore, in an analyst call that same day, PMA stated that the underwriting was not good.  Therefore, McDonnell argues that Plaintiffs were on inquiry notice of the allegedly false statements in the Common Stock Registration Statement by May 1, 2002.  Plaintiffs filed the first complaint in this matter on November 6, 2003, but made no claims regarding the Common Stock Registration Statement. Plaintiffs filed the Amended Complaint on September 20, 2004, after the limitations period. The Amended Complaint was the first to include these claims.  Therefore, McDonnell states that Plaintiffs filed the Securities Act claims pertaining to him outside the statute of limitations and should be dismissed.

As discussed above in the Exchange Act section, shareholders have inquiry notice of a claim if they discover or in the exercise of reasonable diligence, should have discovered the basis for that claim. *NAHC*, 306 F.3d at 1325 (3d Cir. 2002) (citations omitted).  The limitations period will begin to run when the plaintiffs should have discovered the "storm warnings" of the "general fraudulent scheme." *Id*.  The claims here meet this standard because, in May of 2002, Plaintiffs had sufficient

reasons to believe that the Common Stock Registration Statement contained misstatements regarding underwriting. Assuming the allegations in the Amended Complaint are true, it is unreasonable for Plaintiffs to be unaware of problems with PMA's underwriting and actuarial expertise until the November 2003 disclosure of the $150 million loss reserve understatement.

However, the Court will allow the Securities Act claims to relate back to the original complaint. An amended pleading relates back to the date of original pleading if the claim asserted in the amendment "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c). The conduct in both Complaints clearly overlaps. The original complaint alleged materially false and misleading statements regarding PMA's methods of setting loss reserves, which included its underwriting practices. The Amended Complaint alleges similar misstatements during the Common Stock Offering. Therefore, the Court will allow Plaintiffs to amend their complaint to include the Caliber One claims.

**3. Section 15 Claim**

Here, McDonnell makes two arguments for dismissal of the § 15 claim. First, McDonnell states that the § 15 claim fails because the Plaintiffs cannot get relief under §§11 and 12. McDonnell's Mem. at 39-40; 42-43. This argument is denied because, as stated above, Plaintiffs have plead § 11 and § 12 claims. Secondly, McDonnell argues that he was not a "controlling person" as required by § 15 to establish liability. McDonnell's Mem. at 40-42. In order to plead control person liability, a plaintiff must allege facts that show that the defendant had power or potential power to influence and control the activities during the relevant period or that the defendant had actual control over the transaction in questions. According to McDonnell, the Amended Complaint fails to meet either standard. The Court disagrees with McDonnell's position.

Section 15 states that "every person who, by or through stock ownership, agency, or otherwise...controls any person liable under [§§ 11 or 12], shall also be liable jointly and severally with and to the same extent as such *controlled person* to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a) (emphasis added.) Plaintiffs plead that McDonnell, as CFO, signed PMA's financial statements. Therefore, under the plain meaning of § 15, McDonnell can be liable because his acts influenced the setting of loss reserves and the reporting of PMA's financial status. This satisfies the pleading standards. Dismissal at this stage would be premature. McDonnell's motion to dismiss the § 15 claim is denied.

## V. CONCLUSION

Based on the aforementioned, this Court holds that Plaintiffs have stated a claim under § 10(b) of the Exchange Act for the conduct involving PMA Re and Caliber One, as well as the statements regarding PMA internal controls and financial statements against all of the Defendants named in the Amended Complaint. The § 10(b) claim involving PMA Insurance Group in insufficient and is dismissed. Plaintiffs have also stated a claim against all Defendants pursuant to § 20 of the Exchange Act. Regarding the Securities Act, the Court finds that Plaintiffs have stated claims for all of the statements relating to the three PMA public offerings, except as to the Defendants specifically excluded. The Defendants' motions to dismiss the Securities Act claims are denied. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **IN RE PMA CAPITAL CORPORATION** | : | |
| **SECURITIES LITIGATION** | : | **MASTER FILE NO. 03-6121** |
| | : | |
| | : | |
| **This Document Relates to:** | : | **CLASS ACTION** |
| | : | |
| **ALL ACTIONS** | : | |
| | : | |

**ORDER**

**AND NOW,** on this 27th day of July, 2005, upon consideration of Defendants' Motions to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) (Docs. 36, 37, 39-43, 48 & 50), Plaintiffs' Memoranda in Opposition (Docs. 52-56), the Defendants' Reply Memoranda (Docs. 57-62), the various supplemental materials submitted by the parties and the oral argument on this matter held on April 11, 2005, **IT IS HEREBY ORDERED** that:

1. The PMA Defendants' Motion to Dismiss Claims (Doc. 39) is **GRANTED** as to the PMA Insurance claims.  All other claims based on the Exchange Act of 1934 are **DENIED**.

2. The PMA Defendants' Motion to Dismiss Claims based on the Securities Act of 1933 (Doc. 36) is **DENIED**.

3. Defendant Francis W. McDonnell's Motion to Dismiss Claims based on the Exchange Act of 1934 and the Securities Act of 1933 (Doc. 42) is **GRANTED** as to the Securities Act claims based on the Shelf Registration Statement, the Debenture Shelf Registration Statement and Senior Notes

Shelf Registration Statement and **DENIED** as to the Exchange Act claims and the other Securities Act claims.

4. Defendant Sandler O'Neill & Partnership, LP's Motion to Dismiss Claims based on the Securities Act of 1933 (Doc. 37) is **DENIED**.

5. Defendant Ferris Baker Watts, Inc.'s Motion to Dismiss Claims based on the Securities Act of 1933 (Doc. 40) is **GRANTED** as to the Common Stock Offering and the Debentures Offering and **DENIED** as to the Senior Notes Offering.

6. Defendants Credit Suisse First Boston and Banc of America Securities, LLC's Motion to Dismiss Claims based on the Securities Act of 1933 (Doc. 43) is **GRANTED** as to the Senior Notes Offering and **DENIED** as to the Common Stock Offering and the Debentures Offering.

**BY THE COURT:**

**/S/ Petrese B. Tucker**

_____

**Hon. Petrese B. Tucker, U.S.D.J.**

41